### GRANT v. ROSE, Collector of Internal Revenue.

District Court, N. D. Georgia.    May 8, 1929.

No. 912.

Slaton & Hopkins, of Atlanta, Ga., for plaintiff.

Clint W. Hager, U. S. Atty., and C. P. Goree, Asst. U. S. Atty., both of Atlanta, Ga., for defendant.

SIBLEY, District Judge. Following the decision upon demurrer [Grant v. Rose (D. C.) 24 F.(2d) 115], the case was submitted to the court without a jury, on stipulated facts supplemented by other evidence. I find the material facts as follows:

The building in Atlanta, known as the Prudential or Grant Building, was finished by William D. Grant about August, 1899, and had a probable useful life of 50 years from that date. He died November 7, 1901, devising the building, without trusts, to his wife, Sarah F. R. Grant, for her life, with remainder to his son, John W. Grant, for his life, with remainder to certain of the latter's children on conditions and limitations not here important. The devise was assented to by the executors, and Mrs. Grant held the property until her death, September 2, 1920. During the last year of her life she contracted for the installation of four new elevators at a cost of $88,206, but upon an agreement with John W. Grant that, should she die before the use of the elevators had reimbursed their cost, estimated in an agreed way, he should pay his sister, Mrs. Sarah

Grant Slaton, one-half of the unreimbursed cost. John W. Grant and Mrs. Slaton were the residuary legatees under the will of Mrs. Grant, and the agreement was made to preserve equality between them, in view of the fact that the elevators would pass as a fixture to John W. Grant and his children, without benefit to Mrs. Slaton, upon the death of Mrs. Grant.

Mrs. Grant in fact died before any of the elevators were in operation, they being put in use December 8, 1920, and January 10, March 6, and May 29, 1921, respectively. They were paid for out of her estate, but John W. Grant, in pursuance of his agreement, promptly paid to Mrs. Slaton, from his own funds, $44,103, one-half of their cost. He received more than that sum, however, from the estate of Mrs. Grant. The elevators had a probable useful life of 20 years from their installation, an average date of March 1, 1921. Since September 2, 1920, John W. Grant has enjoyed the building, renting its rooms as offices and stores, except three rooms, which he has used as his own offices. For the years 1920, 1921, and 1922 he returned the rents for income taxes, being allowed deduction for all expenses of maintenance and repairs. He claimed also deductions for exhaustion of the building and elevators, which were disallowed, and additional assessments were made of $10,566.06 for 1920, $8,946.18 for 1921, and $7,999.60 for 1922. These were paid to the defendant under protest on February 23, 1926. Refunds were sought and refused, and this suit was brought in due time.

On September 2, 1920, John W. Grant was 53 years old, in good health, and had a life expectancy of about 18½ years. The Grant Building, exclusive of land and the elevators, then had a probable useful life of 29 years, and was of a fair market value of $654,500, as stipulated, but on March 1, 1913, the fair market value was $400,000. The increase was due in part to the growth of the city, but mainly to the post-war depreciation of the dollar. The life estate of John W. Grant therein was, on September 2, 1920, worth two-thirds of the whole, or about $436,000. The life estate of John W. Grant in the elevators, as of March 1, 1921, was worth nineteen-twentieths of the whole, or $83,769. During the years in question an ordinance of the city of Atlanta required the registration of real estate renting agents and a license tax of $50, and of real estate agents contracting or charging for repairs on houses a tax of $25. John W. Grant did not register or pay the tax. The city attorney ruled that, as he was acting only for himself and immediate family, he was not within the ordinance.

### Opinion of Law.

The thing to be decided is what, if any, deductions should have been allowed plaintiff for exhaustion of the Grant Building and elevators. The first question of law, reargued notwithstanding its decision on demurrer, is whether under the Revenue Acts of 1918 and 1921 (40 Stat. 1057; 42 Stat. 227) a life tenant is entitled to any credit for exhaustion of the property, if used in his business, and, if so, whether the credit is to be of the whole or a proportion of the estimated exhaustion. The Revenue Act of 1918, § 214(a)(8), allowed as a deduction from gross income a "reasonable allowance for the exhaustion, wear and tear of *property used* in the trade or business, including a reasonable allowance for obsolescence." The Revenue Act of 1921, § 214(a)(8), contained the same words, with the addition, "in the case of such property *acquired* before March 1, 1913, this deduction shall be computed upon the basis of its fair market price or value as of March 1, 1913." The implication is that property acquired since that date is to be valued as of the date of its acquisition by the taxpayer. In neither act nor in the regulations made to carry them out, is there any special mention in this connection of property held by successive estates as by lessee and reversioner, or life tenant and remainderman. The case of Lynch v. Alworth-Stephens Co., 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660, holding that each of such estates is property, and that there should be an equitable apportionment between the owners of them, where each is using his property in business, was decided March 2, 1925.

The Revenue Act of 1926, enacted February 26, 1926, contains an express adoption of the apportionment rule as to life estates, in section 214(a)(8) thereof (26 USCA § 955(a)(8). Under this act occurred the executive decision referred to as I. T. 2418, by which it was held that a remainderman cannot have any deduction for exhaustion during the life estate, because he is not then using the property in business, and that the life tenant's proportion of the allowance on the depreciable property used in his business, whose useful life will exceed the probable duration of the life estate, is to be fixed by the ratio of the market value of the life estate to that of the remainder "on the date of the vesting of the life tenant's

interest." The values were there arrived at by a complicated computation under a Virginia statute. Seemingly in dissatisfaction with this decision, Congress, in the Revenue Act of 1928, § 23(k) 26 USCA § 2023(k), gave the full deduction for exhaustion to the life tenant as the owner of the whole property for the time being, who is alone using the property, receiving its revenues, and paying the taxes thereon. Much may be said for the justice, the simplicity and practicalness of this provision, but it is plainly a change in the current of legislation, and not declaratory of the previous law. There is no escape from the rule of apportionment established by Lynch v. Alworth-Stephens Co., supra, as proper under the former acts. Under them the taxpayer can have an allowance for exhaustion only in respect of what he himself owns, and not in respect of what the remainderman owns, even though the taxpayer is using both in his business. Whether the denial to the remainderman of any share in the allowance during the life estate is consistent with apportionment we need not consider, as no remainderman is here claiming any such share.

The very recent decision of Weiss, Collector, v. Wiener (October term, 1928) 49 S. Ct. 337, 73 L. Ed. ——, when properly understood, is not to the contrary. The important facts are more plainly apparent from the report of the case in (D. C.) 17 F. (2d) 650, than from the opinion of the Supreme Court. They are that, though the lessee had long-term leases, nothing had been given to him, and nothing had been bought by him in obtaining them, but he paid for these only an annual rent. He had no capital invested in the leases. His property in the depreciable buildings was considered to be more technical than substantial. Although he was under covenant to replace them, it was considered that this liability gave him only a right to deduct his actual expenditures when actually made, and did not authorize him to anticipate and amortize them beforehand. The language of the opinion, "It is true that they [the revenue laws] allow for obsolescence of buildings, etc., where the loss is of materials, not of money, but there as elsewhere the loss must be actual and present, not merely contemplated as more or less sure to occur in the future," does not mean that exhaustion and obsolescence are never to be allowed for until the building falls into ruins, but it had reference to the consideration that Wiener would not lose it unless and until called upon to fulfill his warranties. This is shown by the words following: "If the taxpayer *owns* the property, the loss actually has taken place. But with Wiener it had not, and it might never fall on *him*, as was pointed out by the District Judge. Some of the leases were assigned and others surrendered to the lessor."

A tenant for life has a freehold estate in the property; he is an owner. The very words of the statutes, *"reasonable allowance for exhaustion," "reasonable allowance for obsolescence,"* indicate that estimates and averages are in view rather than demonstrated actualities. Estimates and averages, distributed over the useful life of exhausting and obsolescent property, have always been resorted to in the administration of the statutes, and lump sum allowances, when the property is fully exhausted and obsolete, have been avoided. It was not the purpose of the court to overturn this practice and thus strain the language of the acts. The contrary practice, as applied to life estates, would result in allowing a lump sum to the life tenant if full exhaustion occurred before his death, but to the remainderman if it occurred immediately after. This was not the intent of the acts. The yearly exhaustion of the elevators in the Grant Building is certain and obvious to any mechanic. That of the building is more obscure, but not less certain and inevitable. So far as the life tenant owns them and uses his property in them in his business, he is entitled to a reasonable allowance for exhaustion by the general, but mandatory, language of the acts of 1918 and 1921.

The next question is whether, in ascertaining and apportioning the allowance, the property here involved and the successive estates in it shall be valued as of March 1, 1913, because they were created prior to that date, or as of September 2, 1920, when the taxpayer went into possession as life tenant. For the sake of uniform treatment of all taxpayers, the ruling in I. T. 2418, ought to be followed as far as may be, and the more readily because the statutory provisions involved have been abandoned and will have no future operation. In that case the life estate had vested in possession so soon as the instrument creating it became operative, and there was but one possible date of the vesting of the life tenant's interest. Here the present life estate was limited on a precedent one. It was at first a remainder, and the real question here is as to the time for valuing remainders. There was no contingency as to the person who was to take, to wit, John W. Grant, but his enjoyment in possession of his estate was not only postponed until his mother's death,

but substantially, though not in words, conditioned on his outliving her. In one sense he "acquired" his interest, and it "vested" in him, when the executors of William D. Grant assented to the devise to Mrs. Grant for her life, the assent inuring to the benefit also of the remainderman. Civ. Code Ga. §§ 3895 and 3681. Also, there being no contingency as to the person, John W. Grant could have sold his estate under Georgia law before it vested in possession. Had he done so, it would seem (prior to recent enactments touching the sale of property received by gift) he must have been treated as acquiring the property when his estate vested in law. Nevertheless, where a remainder is sold after it vests in possession, we find the latter vesting taken as the date of valuation by the Board of Tax Appeals in Francis v. Commissioner, Docket No. 116724 B. T. A., April 10, 1929, 15 B. T. A. ——; Kalb v. Commissioner, Docket No. 19422 B. T. A., March 15, 1929, 15 B. T. A. 886.

In the case of profit on a sale the question of allowance for exhaustion does not enter, because all depreciations are reflected in the price obtained. Whatever may be the proper date for valuation in the case of a sale of a remainder, for the purpose of taxing the annual income from the property, reduced by its annual exhaustion, the date of the complete acquisition by its vesting in possession must be taken for its valuation. It is then that the account between the taxpayer and the government touching the matter begins. He is then first able to use the property in his business to make an income from it, and to pay the taxes in respect thereto. An apportionment of the exhaustion based on the then value of his interest so used and exhausted seems equitable. To measure his interest by a valuation far in the past might be most inequitable. As respects the valuation of the property as a whole, there would normally be little difference, because its present value would approximate its former value less the estimated exhaustion meanwhile. But in this case, although the building had not become actually better between 1913 and 1920, but on the contrary had approached nearer to its inevitable destruction, yet it was worth 50 per cent. more dollars at the latter than at the former date. The annual percentage allowed for exhaustion, based on the probable useful life of the building, would therefore be 50 per cent. more on the latter than on the former valuation. The main reason for the abnormality in this case is the change in the value of the dollar meanwhile. Since the present rents, and by consequence

the tax debits, are measured by the inflated dollar, it is equitable that the exhaustion credit should have the same measure.

As to the valuation of the interest of the remainderman, now become life tenant, the equity is even clearer. John W. Grant, in 1913, had a good chance to outlive his mother, and things fell out actually according to natural expectations, yet his life estate in remainder had a much less proportional value in 1913, when the enjoyment was uncertain, than when he entered into possession in 1920. If the precedent life tenant had been his sister, instead of his mother, his interest in 1913 would have had very little value, and, if that value were to fix his proportion of the exhaustion allowance, he could claim very little now. The inequity of fixing it after he comes into possession on a valuation governed by contingencies which have since disappeared seems obvious. Valuation for exhaustion computations ought therefore to be made for all remainders when they fall into possession, the remainder which is a life estate being no exception to the rule. It is true that in the case of a life estate the ratio of value between it and the final remainder changes with each year that thereafter passes but this is due solely to the lapse of time, and exhaustion from that cause cannot increase the allowance on the one hand (see former opinion), nor will it be permitted to diminish it on the other; the valuation of the initial year of the enjoyment of the life estate applying till its ending, as was silently indicated in I. T. 2418.

Touching the mode of valuing the life estate as of September 2, 1920, the Virginia statute used in I. T. 2418, is inapplicable in Georgia, and the idea of valuing the remainder first and then subtracting it from the whole to reach the value of the life estate seems indirect and circuitous.[1] Where the average net income can be ascertained, the life estate is worth ordinarily the present value of an annuity of that amount for the

---

[1] I think the figures actually reached in I. T. 2418, were erroneous. The whole value of the improvement was $20,000, and the estimated depreciation 2 per cent. per year, or $400. The life tenant was entitled to deduct only an equitable proportion of that depreciation, or, what would amount to the same thing, to deduct 2 per cent. of the value of her interest in the improvement. She was allowed to deduct $1222.42 each year, which exhausts the entire value of her interest during her life expectancy. This amounts to including each year the loss in her interest arising from the mere lapse of time. This is forbidden by section 215(b), 42 Stat. 242, where the life interest is "acquired by gift, bequest or inheritance."

life of the life tenant. A table to ascertain such present value is found in 70 Ga. at page 847, which is admissible evidence in Georgia. But in this case I find this method also unsatisfactory, because the net rents have varied, and because it is difficult to decide what portion of them is to be attributed to the nonexhaustible land and what to the building exhaustible at one rate and to the elevators exhaustible at another. Indeed, no reasonable allocation of rents seems to authorize the stipulated value of $654,500 for the building. The elevators are exhaustible at the rate of 5 per cent. per year on their cost of $88,000, and at least 5 per cent. interest should be allowed to them. $8,800 of the net rents must be allocated to the elevators. The building having, in 1920, a remaining useful life of less than 30 years, must have 3⅓ per cent. of annual depreciation and 5 per cent. interest allocated to it, which, on a value of $654,500, would absorb $54,541 of the rents. These two items, aggregating $63,341, about equal the average rents for the years in question, leaving no income at all from the land, which is testified to be worth much more than the building and elevators combined. There must, therefore, be speculative elements of value which cannot be reached by strict mathematics. But value is at last a matter of judgment and opinion. No hard and fast rule of calculation can or ought to be laid down as a matter of law to ascertain, in all cases, the value of a life estate. Upon the data in this case I am of opinion that John W. Grant's present estate of about 18½ years' expectancy in a building having a remaining useful life of 29 to 30 years, was worth in 1920 two-thirds of the whole, and in the elevators, which had a probable useful life of 20 years, was worth in 1921 nineteen-twentieths of the whole, as stated in the findings of fact.

There is yet a further complication as to the elevators, growing out of the contention that John W. Grant is not simply the life tenant of them, but that they are really permanent improvements, made at his expense, and, since his life expectancy is less than that of the elevators, he is entitled to have the whole cost of them deducted during his life, by one of the two methods indicated in the opinion on demurrer. This contention is correct as to one-half interest in them only. The substance of the situation as to the elevators was that Mrs. Grant invested $88,206 in them, knowing that they would soon pass to John W. Grant and his children. He contracted to buy, at her death, a half interest in them and to pay the price to Mrs. Slaton. This he did at an outlay of $44,103 of his money. It does not matter where he got the money which was paid. It was his, and he paid it for the elevators, as being half their value. In effect, Mrs. Grant gave him a life interest in them, and he bought the other half interest, paying the purchase money to Mrs. Slaton, at the direction of Mrs. Grant. The investment in the half interest which he bought he will completely lose at his death, and is entitled to have it allowed him fully by that time. Duffy v. Central R. Co., 268 U. S. 55, 45 S. Ct. 429, 69 L. Ed. 846. The method of equal annual allowances based on the life expectancy of the life tenant (when less than the life of the property) has been adopted by the Board of Tax Appeals. Kissel v. Commissioner, Docket 18203 B. T. A., March 5, 1929, 15 B. T. A. 705, and Docket 21788 B. T. A. April 5, 1929, 15 B. T. A. 1270. Therefore ⅟18.5, or .054, of $44,103, must be allowed in respect of this half interest each year until the investment is fully charged off. In respect of the other half interest, an annual exhaustion allowance should be made of .05 on half the value fixed for the life interest in the elevators.

A motion to dismiss and one for judgment for the defendant has been made, on the ground that the property in question was not used in trade or business by John W. Grant within the meaning of the statutes. The mere fact that he was using the building and elevators to make a taxable income by renting them satisfied the statute in this respect. His failure to register and pay license as a renting or repairing agent is without significance. The motion will be overruled.

A judgment in favor of the petitioner may be presented, based upon the above findings of fact and rulings of law.